**Laura S. Wilkinson, Executrix, Appellee, v. Aetna Life Insurance Company, Appellant.**

### Gen. No. 14,046.

1. INSURANCE—*how proof of death from accidental means may be shown.* Direct evidence is not essential to establish the fact of death from accidental means; circumstantial evidence is sufficient and is frequently more convincing than direct.

2. INSURANCE—*what establishes prima facie showing of accidental means.* External and violent means having been proven, the presumption against self-inflicted injuries and against murder, without further evidence, involves a *prima facie* showing of "accidental means."

3. INSURANCE—*what not essential to establish liability upon*

Wilkinson v. Aetna Life Ins. Co., 144 App. 38.

*claim of death resulting from accidental means.* In order to fasten liability under an accident policy, it is not essential that the jury shall determine or find in what precise manner the fire which caused the death of the insured began or how it proceeded or in what manner the deceased received each of the burns which together resulted in his death.

4. INSURANCE—*how ambiguities in policies are resolved.* Ambiguities contained in policies of insurance are to be resolved in favor of the insured "so as not to defeat his claim to the indemnity which in making the insurance it was his object to secure."

5. EVIDENCE—*when presumptions entitled to probative force.* The presumption which prevails that until the contrary is established it will be assumed that injuries were not self-inflicted, is entitled to probative force and may be made the basis of instructions by the court and of consideration by the jury.

6. INSTRUCTIONS—*what errors cannot be complained of.* A party cannot complain of an error committed at his own instance.

7. INSTRUCTIONS—*when reference to evidence objectionable.* Instructions which single out and call attention to specific features of evidence are properly refused.

8. INSTRUCTIONS—*when as to consideration of evidence calculated to mislead.* The following instruction:

"The jury are instructed that in order to recover in this case it is necessary for the plaintiff to prove by a preponderance of the evidence, or it must appear from the evidence, that the death of the insured was the result of accidental means, otherwise plaintiff cannot recover. The jury have no right to indulge in conjectures or speculations not supported by the evidence; and in determining whether the injuries to the deceased were or were not effected through accidental means, the jury must confine themselves to the evidence and such inferences as they believe may be rightfully and reasonably inferred from the evidence given in the case. The jury have no right to assume the existence of any fact not shown by the evidence to exist, and if they cannot find for the plaintiff without assuming the existence of such fact or facts not so shown to exist, their verdict must be for the defendant,"—

*held,* calculated to mislead the jury into a confusion between mere conjectures and speculations on the one hand and legitimate inferences from facts in proof on the other; in other words, between mere assumptions and circumstantial evidence.

9. INSTRUCTIONS—*must not assume existence of facts in dispute.* An instruction is properly refused which assumes the existence of facts in dispute.

Assumpsit. Appeal from the Superior Court of Cook county; the Hon. BEN M. SMITH, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed October 8, 1908.

Statement by the Court. This is an appeal from a judgment of the Superior Court on May 4, 1907, in

favor of the appellee, who was plaintiff below, against the appellant, who was defendant below. The judgment was for $28,151.30, which sum was the amount with interest to its date of a verdict of a jury in favor of the plaintiff for $27,982.64 rendered March 21, 1907, in said Superior Court.

The verdict was rendered in a suit in *assumpsit* brought by the plaintiff as executrix of the last will and testament of John Wilkinson, deceased, against the defendant, the Ætna Life Insurance Company, on two policies of insurance issued by said company.

The declaration was in eleven counts. The first six were on a policy which the company termed a "Twentieth Century Combination Accident Policy," and numbered 729605.

This policy, which was properly described in the declaration and attached to the same, and was afterwards produced in evidence, is, in its provisions affecting this case, to the following purport:

In consideration of twenty-five dollars premium the company insures John Wilkinson, of Chicago, under classification of "Select," being "a Secretary—Office and Traveling duties" by occupation, for six months from January 9, 1901, from bodily injuries effected through external, violent and accidental means. After providing for a fixed weekly indemnity in case of complete disability and a proportionate part in case of partial disability, the policy proceeds in separate paragraphs alphabetically denominated to provide that various proportionate parts of a "principal sum" shall be paid in place of a weekly indemnity, in the respective cases of different bodily injuries named.

Clauses e. and f. are as follows:

"e. If DEATH results solely from such injuries within ninety days, the said Company will pay the PRINCIPAL SUM of TEN THOUSAND Dollars to the executors, administrators or assigns of the Insured.

"f. If injuries are sustained by means as aforesaid (1) while the Insured is riding as a passenger in or

on any public passenger conveyance, using steam, compressed air, gasoline, cable or electricity as a motive power, or (2) while riding in a regular passenger elevator, or (3) while riding a bicycle (not in a race for prize or purse, concerning which risk see condition two), or (4) *in consequence of the burning of a building in which the Insured shall be at the commencement of the fire,* the amount to be paid shall be double the sum specified in the clause under which claim is made, subject to all the conditions of this policy.''

The policy then sets forth thirteen conditions on which it is issued and accepted; those which are of significance in this litigation, beyond the provisions about notice, proof of loss, filing of claim and bringing suit (which provisions it is conceded by defendant were all complied with by plaintiff) being only these:

''2.   If the Insured is injured in any occupation or exposure classed by this Company higher than the premium paid for this policy covers, the principal sum insured ' and weekly indemnity shall be only such amounts as said premium will purchase at the rate fixed for such increased hazard.   If accidentally injured while riding a bicycle in a race for prize or purse, the amounts payable will be one-third of the double benefits provided by clause 'f' hereof.

5.   In event of death, loss of limb or sight or disability due to injuries intentionally inflicted upon the Insured by any other person (except assaults committed for the sole purpose of burglary or robbery), whether such person be sane or insane, or under the influence of intoxicants or not; or due to injuries received while fighting or in a riot; *or due to injuries intentionally inflicted upon the Insured by himself; or due to suicide, sane or insane,* or due to the taking of poison, voluntarily or involuntarily, or the inhaling of any gas or vapor; or due to injuries received while under the influence of intoxicants or narcotics, then, in all such cases referred to in this paragraph, the limit of this company's liability shall be one-tenth the amount otherwise payable under this policy, anything to the contrary in this policy notwithstanding.

7. No claim against this Company under accident policies shall be valid in excess of ten thousand dollars (or twenty thousand dollars under clause 'f' above)," etc.

This policy, as the declaration alleged and as was admitted on the trial, was kept in force by renewals and was renewed on July 9, 1904, for a term of six months from that date by the payment of twenty-five dollars by John Wilkinson and the issuance to him by the company of a contract or renewal receipt which continued the policy in force to January 9, 1905.

The counts of the declaration on this policy in different forms averred that on September 7, 1904, while said policy was in force, John Wilkinson suffered injuries effected through external, violent and accidental means and in consequence of the burning of a building in which the said John Wilkinson was at the commencement of the fire, from the result of which injuries the said John Wilkinson died within ninety days thereafter, on September 9, 1904, and that thereby the defendant company became liable to pay to the plaintiff as executrix the sum of twenty thousand dollars.

The remaining counts of the declaration, except the last, which is made up of the consolidated common money counts in *indebitatus assumpsit,* are on another policy of insurance issued by the defendant company to John Wilkinson and denominated by the company "Regular Form Accident Policy," and numbered 176163, by which, in consideration of the premium payment of five dollars, the Ætna Life Insurance Company insures John Wilkinson from bodily injuries effected through external, violent and accidental means. This policy, which was also properly described in and attached to the declaration and afterwards produced in evidence, ran originally for three months from December 17, 1900. It had been continued in force and renewed for the last time on June 17, 1904, for three months from that date. This policy contains analogous although not identical provisions

with policy number 729605, concerning indemnity for disability through injury and the payment of a principal sum or a portion thereof in the case of certain specified injuries, and the following clause under which the claim on this policy is made in this suit:

"c.  If death results solely from such injuries within ninety days, the said Company will pay the principal sum of five thousand dollars to the executors, administrators or assigns of the insured."

The conditions in the said policy affecting the claim are:

"2.  The maximum liability of the Company hereunder in any policy year shall not exceed the principal sum thereby insured," etc.; and

"3.  This insurance does not cover disappearance; *nor suicide, sane or insane; nor the result of injuries, fatal or otherwise, inflicted intentionally by the insured*, or intentionally by any other person (except assaults committed for the sole purpose of burglary or robbery), nor the result, fatal or otherwise, of injuries of which there is no visible mark upon the body (the body itself in case of death not being taken as such mark), nor the result," etc., etc.

Suitable allegations in the counts on this policy were made, that while it was in force on September 7, 1904, John Wilkinson suffered injuries through external, violent and accidental means, from the result of which injuries solely he thereafter died on the ninth day of September, 1904, whereby the defendant company became liable to pay to the plaintiff on this policy five thousand dollars.

The claim upon the two policies was thus twenty-five thousand dollars.

To this declaration the defendant pleaded five pleas:

First.  The general issue of *non-assumpsit*.

Second.  That the plaintiff should not recover over $667 under the first six nor the last count of the declaration (relating to policy No. 729605), because the in-

juries from which John Wilkinson died were intentionally inflicted on himself.

Third. That the plaintiff should not recover anything under the 7th, 8th, 9th, 10th nor last counts of the declaration (relating to policy 176173), because the injuries from which John Wilkinson died were intentionally inflicted on himself.

Fourth. That the plaintiff should not recover over $6,667 on the first six or the last counts of the declaration (relating to policy 729605), because the injuries described were received by the insured while he was engaged in the occupation of a weaver, which was classed by the defendants as "ordinary" and involved a higher premium than the "Select" class, to which Wilkinson was accredited in the policy.

Fifth. The plaintiff should not recover over $2,667 on the 7th, 8th, 9th, 10th and 11th counts of the declaration (relating to policy 176163), because at the time of receiving the injuries the insured was engaged in the occupation of a weaver.

The plaintiff joined issue on the first plea and replied to each of the others double, by a replication "de injuria" and a direct traverse.

Upon the issues thus formed the cause came to trial before a jury. There was no controversy on the facts. The plaintiff produced her witnesses, much of whose testimony was given over the objection of defendant, and rested. The defendant offered no evidence, but moved for a peremptory instruction, which was refused. The jury found, as above stated, for the full amount claimed by the plaintiff.

A motion for a new trial was made in writing by the defendant, based on the following reasons:

First. That the court improperly admitted and refused to strike out evidence.

a. As to the disposition and temperament of John Wilkinson;

b. As to his practice and habits in making targets (for archery) in and using the loft of the barn in the

rear of 482 La Salle avenue, in Chicago (the place where he received the injuries) ;

c. Relating to the position and condition of the doors and windows in said loft while Wilkinson was at work therein prior to the time of receiving the injuries in question;

d. Relating to the making of the target found in said loft after the injuries in question were received;

e. Relating to the manufacture and sale of targets by Wilkinson, his sons and the Hope Chemical Company, prior to and after the injuries in question were received;

f. Relating to the relations of Wilkinson with other members of his family;

g. Relating to the physical condition of Wilkinson while at the Alexian Brothers Hospital and of his body at the time of the autopsy thereon;

h. Of the habits of Wilkinson relative to smoking tobacco and cigars.

Second. That the court permitted plaintiff's attorney to make improper assertions and arguments to the jury, and allowed said improper assertions and arguments to stand.

Third. That the court refused to give to the jury the peremptory instruction asked by the defendant at the close of the plaintiff's case.

Fourth. That the court improperly gave to the jury the first, second and third instructions asked by the plaintiff.

Fifth. That the court improperly refused to give instructions numbered from one to twelve, asked by the defendant.

Sixth. That the verdict was against the law and the evidence, and was excessive.

The court, after argument, overruled the motion for a new trial and gave judgment on the verdict. From that judgment the defendant appealed. In this court it assigned errors covering the reasons set forth in the lower court for a new trial, but has insisted in

argument upon the following points under them only:

First. That the evidence fails to show that the insured's injuries were effected through accidental means.

Second. That the evidence fails to show that the injuries sustained by the insured were in consequence of the burning of a building.

Third. That the evidence fails to show that the insured was in the building at the commencement of the fire.

Fourth. That the court erred in denying defendant's motion for a peremptory instruction.

Fifth. That the court erred in admitting evidence—

A. That Wilkinson was an inveterate smoker and in the habit of smoking almost all the time while at work.

B. That Wilkinson was of a cheerful, lively, hopeful, happy disposition and temperament.

Sixth. That the court erred in giving the first instruction requested by plaintiff and hereinafter set forth.

Seventh. That the court erred in refusing to give the 1st, 2nd, 3rd, 7th, 8th and 11th instructions (hereinafter described), requested by the defendant.

Eighth. That the court refused to grant a new trial on account of the preceding matters and because the verdict was against the weight of the evidence.

The facts developed by the evidence were:

John Wilkinson, the insured, resided at No. 482 and 484 La Salle avenue, in Chicago. This is on the west side of the street between Goethe and Schiller streets. The house was a double one and in the north half of the house, or 484, the Hope Chemical Company (in which the insured, John Wilkinson, and his son, John Wilkinson, Jr., were interested, the former being secretary and the latter president and treasurer of it) had their offices and manufactory. The company there, under Mr. Wilkinson's direction, manufactured an ointment or salve, to which the name of "Chiolin"

had been given, and which the company sold to physicians and drug stores. The insured, Mr. Wilkinson, was in September, 1904, not far above or below sixty years of age. His exact age does not appear in the record, but he was old enough to have a son then thirty years old and young enough to be enthusiastically fond of sports, a constant practicer in archery and a participant in archery contests. He was married, with at least two sons in business, and was on the best of terms and relations with his family, and was of a sunny, cheerful, humorous disposition and temperament. During the first week of September, 1904, and before, he was in good health, happy, hopeful and cheerful. He had a summer home at Fox Lake, Illinois, and his wife and at least one son were there all or most of the time during the Summer of 1904. His habit was to go there and stay with his family for a few days every little while during that Summer, and then return to his house in Chicago for a few days, attending to the business of his company. Mrs. Lannon, a woman for many years an employe of the family in one or another capacity, was in the Summer of 1904 (and apparently from her testimony also in former years) housekeeper for the Wilkinsons at 482 and 484 La Salle avenue, while Mrs. Wilkinson was at Fox Lake. She prepared Mr. Wilkinson's meals and attended to the other household duties in the kitchen and elsewhere. She testified that when she was ready she rang the bell and he was always there to attend to his meals. His younger son—a young man—employed as clerk in a business office in the city, seems to have slept in the house, and perhaps have taken his meals, except the midday one, there during the Summer of 1904, but he was not there during the day. On September 7th, after the midday meal, which was prepared for Mr. Wilkinson by Mrs. Lannon, there was nobody about the house except himself, Mrs. Lannon and a laundress, who came to the house to wash and was in the laundry. In the rear of

No. 482 was a two story brick barn with a flat gravel roof, opening from the east side of the alley running north between Goethe and Schiller streets, and opening also from the back yard of 482 and 484 La Salle avenue. The yard door was a small door; the alley doors were double, swinging inwardly. The second floor or "barn loft," as it was called in the testimony in this case, was reached by stairs located in the northeast corner of the building. These stairs were enclosed on the sides and had a door at the bottom. The second floor contained a large room, designed for a hay loft, and a small room making an L from the southeast corner, designed for a coachman's room, but disused for that purpose for many years. It would seem that the barn below was not at that time in use for stabling. At all events, the loft was not used for hay. The walls of the small L room were plastered, but those of the large room or "loft" were unplastered. The loft contained only two windows, both in the east wall, one in each room. The window in the large room was above the stairs near the north wall. There was a scuttle hole in the roof, about the center of the large room, with a matched board covering. There was a large doorway in the west or alley side of the room, with double doors swinging inwards. The joists supporting the roof were made of soft wood and were not ceiled, but exposed. The floors, partition and roof boards were made of soft wood, tongued and grooved. This loft in the Summer of 1904 was used as a store room, and was also used as a work room in which Mr. Wilkinson and his two sons made archery targets. They made these targets for their own use, and also made a few which they sold for the account of the Hope Chemical Company. These targets were made of straw and were 48 inches in diameter and five or six inches thick, covered on one side by a white oil cloth face with concentric colored rings thereon. They were made by tying together with twine strips of straw twelve or fourteen feet long, doub-

ling and winding some of it to make a center, winding the rest around that center, and sewing the whole with heavy marlin. In making these targets the straw was taken up to the loft in handfuls about as large as a man's arm, and laid along the floor in these long strips. Mr. Wilkinson, the insured, laid out the straw and generally superintended the work, in which the young men assisted. They had a bench in the loft made of a board or boards resting on boxes, which they used while working.

About ten days before September 7, 1904, Mr. Wilkinson, with his younger son, who had come in from the Summer home at Fox Lake, had been working on some targets, which were being made for the account of the Hope Chemical Company. The arrangement of the doors and windows in the loft, whenever they worked, depended on the weather. If the wind blew from the west strong, it would blow the straw so that it could not be satisfactorily worked if the alley doors were opened, so they were kept shut and closed on such occasions by a piece of timber set against them. So too, on hot, bright days in the afternoon, the doors were kept closed as a protection against the sun. At other times the doors were sometimes opened, one or both, but the windows were almost always kept closed. There was light enough to work by coming in at the windows, and if the sun was shining brightly it would shine through the cracks at the bottom of the door, which did not shut tight, and much light was given thereby also.

During the ten days preceding the 7th of September Mr. Wilkinson had spent several days at Fox Lake, where, in good health and spirits, he had been repairing a boat, making bow strings, instructing his son how to make them, and practicing archery. He returned from there on Monday evening, September 5th. There was a target in the loft not quite completed on the 7th, on which Mr. Wilkinson was to do some special work.

The 7th was a hot day and the sun was shining brightly. On the afternoon of that day, at about two o'clock, after Mr. Wilkinson's midday meal, Mrs. Lannon, who was working in the kitchen of the house, saw Mr. Wilkinson place a target, arrows, and pencil and paper with which to keep score, in the back yard near the kitchen door, and then go to the barn. He had been there for some time when a boy came to the basement of the house and asked for some oyster tins. Mrs. Lannon, not being able to tell the boy anything about them, went out to bring Mr. Wilkinson in or to ask him about them, and met Mr. Wilkinson coming towards the house. He came in and talked to the boy, and then went back to the barn. Mrs. Lannon then noticed that he had a partly smoked cigar in his mouth. This was the last seen of Mr. Wilkinson until at about a quarter to four o'clock that afternoon he was removed from the barn loft, unconscious and suffering from the injuries by burning from which he afterward died, as hereafter detailed.

At about 3:40 p. m. an alarm of fire from the alarm box at the corner of Goethe and Wells streets reached the fire engine house at 437 Wells street, and also the police station at Larrabee street and North avenue.

The firemen of the company at once responded with the hose wagon, locating the fire immediately by report as being in the alley off Goethe street, and finding when the wagon reached there ''smoke coming out of the cracks all over the barn, on top of the roof'' and ''around the hay loft and along the roof on the alley side and on the south side of the south wall along up towards where the rafters come down over the top of the brick work.'' The police station also responded at once with a patrol wagon, containing a stretcher. The patrol wagon stopped at the corner of Goethe and Wells streets. The policemen cleared the alley to avoid the interference of a crowd with the work of the firemen. Lieutenant Franzen, in command of the fire company, who drove the hose cart, stopped it back

of the barn, with orders to unreel a length of hose, and when another fireman had placed a ladder against the barn reaching to the loft doors, ran up it with an ax and smashed them in. He was met, he says, "with a blaze of smoke and hot air. I told the fellows when I saw the blaze what it was, and jumped down from the ladder, got my fire hat—I turned the hat down so as to protect me from the heat." One fireman—Shaw—was then standing by the ladder with a hand-pump, and after sending another to order water from the engine, Franzen, with Shaw, went up the ladder with the pump and a five gallon water tank, and played a small stream on the fire to keep it down until the big stream should come from the engine. Shaw was inside with the nozzle, and Franzen, with one foot on the ladder and one inside, was working the pump. There had been a cry in the alley that there was a man in the barn, but Franzen says he could see nothing but smoke and flame, and could not see across the room.

Another fireman—Schmelzer—came up the ladder alongside of Franzen, and taking the pump from him commenced to work it, when Shaw, inside, said, "There is a man over there," and indicated the direction. Schmelzer crouched low to the floor and went southeasterly in the direction indicated. The room was heavily charged with smoke. He had to turn his head and hold his breath lest he should inhale flame. After going six or seven feet he struck some straw with his feet, stretched out his hand and felt of the straw, made a further stretch and caught a man's right hand, then seized his wrist and dragged him to the door. It was Mr. Wilkinson in an unconscious state and severely burned. Shaw helped Schmelzer to lift the man (who was of light weight) into Lieutenant Franzen's arms, who carried him down the ladder, still unconscious, to the stretcher from the police patrol wagon. He was then carried in the wagon to the Alexian Brothers Hospital. Besides his exterior

burns, hereafter described, he seemed, as the policeman, Geis, in charge of the wagon, testified, to be burned internally from inhaling heat, and was patting his chest and speaking or trying to speak. Whether he had then entirely recovered consciousness or not, does not appear. His utterances, if any, at that time on his injuries or their cause or the origin of the fire, and those made afterward at the hospital before his death, when he was conscious and conversed with his wife and sons and friendly physicians, were excluded from evidence on the objection of defendant.

It was found at the hospital and at the autopsy after his death, that he had been severely burned on both sides of his face and neck, on his back, on both hands, parts of his left hand being completely charred, and on the front of his legs. One-third of the area of his body was burned either to the first, second or third degree. There was also an inflamed and blistered condition of the larynx, caused by the inhalation of hot air.

It is in evidence that during these two days he was in fairly comfortable condition and expected to recover, although the physicians recognized the fact that his injuries were fatal. He died on September 9th.

When Lieutenant Franzen was carrying Mr. Wilkinson from the foot of the ladder to the patrol wagon, the water had already been turned on from the engine. Franzen was so informed at the foot of the ladder, and shouted to the firemen in the barn to look out for the water. Therefore a few seconds, after Mr. Wilkinson was taken out, the water reached the barn, the pipe nozzle of the big hose was opened, and an inch and a quarter stream turned on the burning ceiling and dashed about. In two or three minutes the flame was out of the loft, and in a minute or two more the ceiling had stopped burning. Then, in order to avoid flooding the building, the nozzle was changed to a quarter inch or pin stream, which was also played on the rafters or joists to get the fire out and prevent

Wilkinson v. Aetna Life Ins. Co., 144 App. 38.

rekindling for some minutes, after which the company was ordered back to quarters. Just as Franzen reached the bottom of the ladder with Wilkinson in his arms, Pipeman Ryan of the fire company, who had been coupling the engine to send the water, ran by him through the lower floor of the barn and up the stairs to the loft and broke the window at their head to let the smoke out and the air in. Then he went to the window in the L room and broke that out. Some other fireman, at about the same time, broke open the scuttle hole in the roof.

The condition of the barn loft as to the burning already consummated when Wilkinson was found and taken out, is a subject of contention between the parties in argument. Three men (besides Wilkinson) are shown to have seen it before he was taken out—Franzen, Schmelzer and Shaw. Ryan saw it only so long afterward as it took him to get from the alley doors of the first floor to the head of the stairs on the second—scarcely an appreciable time, it would seem, under the circumstances. Franzen, Schmelzer and Ryan were witnesses.

Franzen's testimony as to what met him when he smashed the doors in has been given. He testified further that immediately after his return and the big stream had been turned on the ceiling, he noticed that some of the floor was burned.

Schmelzer testified that when he got up to the loft he saw the flame and was obliged to crouch low and turn his head and hold his breath lest he should inhale the heat, and in answer to direct questioning, said that there was some straw burning and that the roof was burned and the ceiling inside the roof and the floor, before he got Wilkinson out, and that after Wilkinson was taken out there was some straw and a couple of boxes and a board burned, and that the flame from the ceiling continued but two minutes, and the fire three or four only, from the time the big stream was turned on the ceiling, which, as has been noted, was almost

contemporaneous with Wilkinson's removal; that the ceiling where the rafters burned was directly over the place where straw was lying on which Wilkinson was found, and from there extending towards the alley doors. In cross-examination he was asked if "It was after you took him out and the smoke cleared away, so that you could see, that you observed the condition of the roof and the floor?" And answered, "I saw the flame go up there before I got to him, go towards the roof." Asked "If it was not true that only the floor underneath the straw where Wilkinson was lying, was scorched?" he answered, "It was burned more than that—I wouldn't take the burning it got for that."

In re-direct examination these questions and answers occurred:

"Q. When did you first notice that the ceiling or the rafters of the ceiling, or the rafters of the ceiling of the barn, were blazing?

A. As soon as I got in there.

Q. Now, do you recall when it was you first noticed the target?

A. Excuse me a minute—you asked when I noticed the rafters were burning?

Q. Yes, sir.

A. When I first noticed them?

Q. Yes, sir.

A. That was, let me see—that was right after we got Wilkinson out, I believe, that I first noticed it.

Q. After what?

A. After I got Mr. Wilkinson out, that I first noticed it. When I noticed it, that was when I went over to get him. I saw the flame going up towards the ceiling alongside of where I got hold of Mr. Wilkinson, and then we got the water and we hit the ceiling. I figured on it went up agin the ceiling, the burning ceiling. We hit it and while I was working the line on the ceiling, they raised this scuttle hole, that

took the smoke out, and then I saw the ceiling was still burning in places.''

In re-cross-examination occurred the following questions and answers:

''Q. When did you begin to play the small hose on the ceiling?

A. That was after we wet the whole ceiling down with a one-inch and one-eighth or one inch and one-quarter, and we used that afterwards in order not to flood the building.

Q. That was after the body had been taken out?

A. Yes.

Q. The ceiling was on fire then, wasn't it?

A. Yes.

Q. When you took this large hose that you speak about to throw a large stream of water against the ceiling, the smoke was so thick up above your head that you could not see the ceiling, wasn't it? A. Yes, sir.

Q. You could not tell what was going on up there?

A. No, sir.''

Ryan testified that when he got up to the loft he found a lot of smoke and saw some flames around the south wall, and that after the fire was put out he saw the rafters were burned near the roof, and that the floor and boxes were burned. In cross-examination he said that the floor was burned at a place about six feet from the west wall and six feet from the south wall, that there was straw lying around the burnt spot; that he did not look over the floor; but that was the only place that he noticed where the floor was burned; that the rafters and the roof were burned over the place burned in the floor; that after the fire was over he could see how much the rafters were burned, and that some were burned worse than others and more than a quarter of an inch deep.

The condition of the barn loft after the fire was over was described by Arthur Wilkinson also, who

saw it about six o'clock that evening. About one-quarter of the surface of the ceiling was burned, the rafters were badly charred and the boards of the roof above them. The piece of the ceiling thus burned was about twelve feet square, and directly above where the floor was burned. The floor was charred in the southwest corner of the loft.

Schmelzer also testified that the floor, although not burned through, was burnt a quarter of an inch or more deep, and the rafters charred to the same depth.

The quantity and condition of the straw in the loft before, during and after the fire also figures in the argument.

As before noted, the straw with which Mr. Wilkinson worked in making the targets was taken up to the loft in handsful about as large around as a man's arm, and laid along the floor in strips twelve to fourteen feet long. Arthur Wilkinson testified that on the day of the fire there had been only three or four armsful of this straw in the loft, scattered around the floor, but straightened out, and that when he got there at six o'clock there was none there—that it had been thrown out. Schmelzer, as noted, said that in groping for the man said to be in the barn, he struck some straw with his foot and afterwards with his hand, and that there was some straw burning both before and after he got Mr. Wilkinson out. His further testimony about the straw was, that after they had taken Wilkinson out, he saw straw lying about where Wilkinson was found; that the part of the floor that was burned was about where the straw had been lying; that he helped clean up the place and throw the rubbish out; that he should "guess" the straw Wilkinson was lying on was more than three or four inches thick; that they threw out into the alley a big armful, almost as much as a man could carry. He explained this afterward to mean that all the straw that was in the loft—that which was unburned and (judg-

ing by the ashes) that which was burned—would have made such an armful.

Franzen testified in cross-examination that "There wasn't much of anything in the loft" (meaning after the fire) only a little wet straw that they swept up in the part where Mr. Wilkinson was lying—straw which had been wet with the water from the pump and the engine hose.

Ryan, after the fire was put out, observed some straw on the floor, together with boards and boxes and part of an old target, and the straw was lying about the burned places on the floor and right around the boxes. He was cross-examined thus:

"Q. Did the straw lying on the floor in that spot all look like it had been burned?

A. What was left of it looked as if—

Q. It had been burned?   A. It had been burned.

Q. Were there ashes of the straw lying scattered all about?   A. Yes, sir.

Q. Did that extend north of the boxes?

A. It extended directly right south.

Q. How close to the boxes did the ashes go?

A. I could not say how close to the boxes."

The following admissions were formally made on the record by the defendant company at the trial, it waiving proof of the facts thus admitted:

First.   That it issued and delivered to John Wilkinson, the plaintiff's testator, the two policies of insurance numbered 729605 and 176163, as set forth in the declaration.

Second.   That both of said policies of insurance were renewed and premiums therefor paid, for and during a period covering the 7th day of September, A. D. 1904.

Third.   That on the seventh day of September, A. D. 1904, while said policies were in force, the said John Wilkinson suffered injuries in Cook county, Illinois, effected through external and violent means,

from the result of which injuries solely the said John Wilkinson died on the ninth day of September, A. D. 1904, in the county aforesaid.

Fourth.   That said John Wilkinson left a last will and testament, naming the plaintiff as the sole executrix thereof, which will was duly probated and of which the plaintiff was appointed executrix.

Fifth.   That all notices and proofs specified in and required by the sixth clause of policy 729605 and the fifth clause of policy 176163 were furnished to the defendant in the manner and within the time specified in said clauses, and received and accepted by the defendant and by it retained without any objection thereto.

It will be seen that these admissions and the evidence detailed left as issues of fact, to be decided by the jury in the Superior Court, only the questions, first, whether the injuries from which Wilkinson died were effected through *"accidental"* as well as "external and violent" means; and, second, if so, whether these injuries were "sustained in consequence of the burning of a building in which the insured was at the commencement of the fire," thus making due to the executrix the double indemnity stipulated in clause f. of policy 729605.

The jury having answered both these questions in the affirmative, the questions for this court are, whether the verdict should be set aside for lack of, or as clearly against the weight of the evidence; and if not, whether there was reversible error in the instructions given, or in the refusal of those refused, or in the admission of evidence.

Of the three instructions given at the instance of the plaintiff, only the first is complained of by the defendant.   It was as follows:

"The court instructs you that where a man suffers injuries which might have been caused by accident or might have been intentionally inflicted upon himself, and there is no preponderating evidence as to the

cause of such injuries, the presumption is that they occurred by accident."

The court gave, at the instance of the defendant, twelve instructions, numbered from thirteen to twenty-four inclusive, but refused twelve offered at the same time.

In the respective arguments of the parties, the defendant claims that it was error to refuse the instructions numbered 1, 2, 3, 7, 8, 10 and 11, and the plaintiff insists that so far as they correctly stated the law, these were covered by those numbered 14, 15, 16, 17, 20, 21, 22 and 23.

The instructions named are therefore here given, to complete this statement.

Those enumerated which were given were as follows:

"14.   The jury are instructed that to entitle the plaintiff to recover the double indemnity provided for in clause f. of policy numbered 729605, you must find from the evidence the following material facts: first, that John Wilkinson suffered injuries effected through external, violent and accidental means; second, that he sustained such injuries in consequence of the burning of a building; third, that he was in said building at the commencement of the fire; and, fourth, that his death resulted solely from such injuries within ninety days.   And you are further instructed that if you are unable to find from a preponderance of the evidence and under the instructions of the Court in this case, either one of those facts, then the plaintiff is not entitled to recover such double indemnity.

"15.   In the policy sued upon in the first, second, fourth and fifth counts of the declaration herein, it is provided that if the death of the insured resulted solely from injuries effected through external, violent and accidental means in consequence of the burning of a building in which the insured was at the commencement of the fire, the amount to be paid under such circumstances should be double the sum other-

wise payable in event of death. Before the defendant can be held liable under the provision of the policy for double the sum otherwise payable in the event of death, it is incumbent upon the plaintiff to show by a preponderance of the evidence not only that the death of the insured resulted solely from injuries effected through external, violent and accidental means, within the meaning of the policy, but that such injuries were sustained in consequence of the burning of a building in which the insured was at the commencement of the fire. Before you can find the defendant liable under this provision of the policy you must believe from a preponderance of the evidence that the injuries sustained by John Wilkinson were directly and proximately in consequence of the burning of the building, and that John Wilkinson was in the building at the commencement of the fire. It is necessary that both of these facts be established by a preponderance of the evidence.

"16. The declaration in this case alleges, among other things, that the insured, John Wilkinson, suffered injuries effected through external, violent and accidental means, from the result of which injuries solely the said John Wilkinson died within ninety days thereafter. The defendant pleaded the general issue, which makes it incumbent upon the plaintiff to prove by a preponderance of the evidence that the death of the insured was the result of external, violent and accidental means, and the jury is not permitted to assume the existence of such facts because they are alleged in the declaration.

"17. The court instructs the jury that the defendant sets up in its pleas that the injuries to the plaintiff were self-inflicted. The presumption of law against self-inflicted injuries places the burden upon the defendant to establish that defense. This does not mean that the defendant, in order to establish that defense, must have a witness or witnesses testify as to that fact in its behalf. This defense may be established, or the presumption of law against self-inflicted injuries may be overcome by the evidence introduced by the plaintiff or by such inferences as the jury may

rightfully and reasonably draw from such evidence; and the fact that the defendant has not seen fit to introduce any evidence in this case does not relieve you from the duty of determining from the evidence in the case whether the injuries sustained by John Wilkinson were self-inflicted.

"20. If the jury believe from the evidence that the injuries sustained by John Wilkinson were caused by the body of said Wilkinson coming in contact with fire, this fact satisfies the requirements of the policy in relation to the injuries being effected through external and violent means, but does not satisfy the requirements of the policy that the injuries must result from accidental means, and it is incumbent on the plaintiff to prove by a preponderance of the evidence that the injuries resulted from accidental means.

"21. The law presumes, in the absence of evidence to the contrary, that John Wilkinson, at the time he entered the loft, was sane and in full possession of his mental faculties in their normal condition; that he was then conscious; that any act done by him in the loft was voluntary; and that he contemplated the probable and natural consequences of his voluntary acts. And the court instructs you that the law presumes each of these conditions to exist upon the part of John Wilkinson until the contrary is shown by a preponderance of the evidence.

"22. The fact, if you find from the preponderance of the evidence that it is a fact, that John Wilkinson sustained injuries by his body coming in contact with fire, does not in itself raise a presumption that the means effecting the injuries were accidental nor relieve the plaintiff from the burden of proving, by a preponderance of the evidence, that the means causing the injuries were accidental. The law presumes, in the absence of evidence to the contrary, that the injuries sustained by John Wilkinson were not self-inflicted; but this presumption alone is not sufficient to warrant you in finding that the means producing the injuries were accidental.

"23. If the jury, from all the evidence, is unable to find that the injuries to the assured were sustained in

consequence of the burning of the building, or that the insured was not in the building at the commencement of the fire, or if the jury believe that the preponderance of the evidence shows that the injuries to the insured were not in consequence of the burning of the building, or that the insured was not in the building at the commencement of the fire, the Company is not liable under clause f. of the policy numbered 729605.''

The proffered instructions, the refusal of which is complained of, were as follows:

''1.   The jury are instructed that the words 'If injuries are sustained by means aforesaid in consequence of the burning of a building,' contained in clause 'f' of the policy numbered 729,605, mean that such injuries must be sustained not only through external, violent and accidental means, but they must also be sustained by reason of, or as the effect of, the burning of a building.   And you are further instructed that if you believe from the evidence that the building did not burn until after the injuries were sustained by the insured, then the plaintiff is not entitled to recover the double benefit provided for in said clause 'f'.

2.   If the jury believe from the evidence that the injuries sustained by John Wilkinson were solely in consequence of the burning of straw in the loft of the barn, and that the burning of a building was not the proximate cause of the burning of the straw, then the court instructs you that said injuries cannot, under the law, be said to have been in consequence of the burning of a building, and you must find for the defendant upon that issue in the case.

3.   The jury are instructed that in order to recover in this case it is necessary for the plaintiff to prove by a preponderance of the evidence, or it must appear from the evidence, that the death of the insured was the result of accidental means, otherwise the plaintiff cannot recover.   The jury have no right to indulge in conjectures or speculations not supported by the evidence; and in determining whether the injuries to the deceased were or were not effected through accidental means, the jury must confine themselves to the evidence and such inferences as they believe may be right-

Wilkinson v. Aetna Life Ins. Co., 144 App. 38.

fully and reasonably inferred from the evidence given in the case. The jury have no right to assume the existence of any fact not shown by the evidence to exist, and if they cannot find for the plaintiff without assuming the existence of such fact or facts not so shown to exist, their verdict must be for the defendant.

7. There is no evidence in this case as to when the fire in question was started, and the Court instructs you that you have no right to indulge in any conjecture or speculation as to when it was started in determining the question whether John Wilkinson was in the building at the time of the commencement of the fire.

8. The court instructs the jury that in the absence of evidence as to when the fire in question commenced, they have no right to infer that it commenced after the deceased entered the barn.

10. If the jury believe from the evidence that the fire in question originated in the straw in the loft of the barn and that before said fire was communicated to the building John Wilkinson sustained the injuries in consequence of which he subsequently died, then the court instructs you that the plaintiff has no right to recover under clause 'f' of policy numbered 729605.

11. The court instructs the jury that the word 'building' as used in clause 'f' of policy numbered 729605 is understood to have been used in its ordinary and customary sense, but that the straw in the loft of the barn, if you believe from the evidence there was straw in the loft, was not a part of the barn in question, nor a part of a building within the meaning of the policy; further, that the burning of the straw, if you believe from the evidence that the straw was burning, does not constitute the burning of a building within the meaning of the policy.''

DANIEL F. FLANNERY and ILA H. SAMPLE, for appellant.

SAMUEL ADAMS and CARL R. LATHAM, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

The argument of the appellant (defendant) in this case that there was no evidence in the cause sufficient to sustain a finding of the jury that the injuries from which Mr. Wilkinson died were effected through accidental means, is subtle rather than forceful. Reduced to its lowest terms, it is tantamount to the position that evidence to be sufficient must be direct. But circumstantial evidence is frequently as satisfactory and not infrequently more satisfactory than direct evidence to establish the existence or occurrence of any fact, and in accordance with this hypothesis all the affairs of men are conducted. "Presumptions on presumptions," "mere conjectures," "simple speculations," and like expressions, are used by courts to show what a jury may not indulge in, but no court has said, in a case like this, where no living witness can be produced to testify directly to the happening of an accident, that happening cannot be inferred by a jury from other facts viewed in connection.

A man in good health and spirits is accustomed to work with straw in his barn loft and smoke the while. He has been engaged on a piece of such work, which was unfinished on a certain day. He is seen on that day to go to the barn loft, remain some time, come to the house on a trivial errand and return to the barn with a half smoked cigar in his mouth. After an hour or so, in which nobody sees him come from the barn, although there are people in the rear of the house, there is an alarm of fire; the barn loft is broken into by firemen, the straw and the wood work are on fire, the flames and smoke are overpowering, and the man is found unconscious and burned so severely that he dies from the effects. What inference from any facts could be more inevitable for any court or jury disposed to look at plain facts in a common sense way, than that the burns which the man had suffered were "effected through accidental means," or else were

"intentionally self-inflicted?" There is no third hypothesis conceivable except through a refinement of distinctions not consistent with the ordinary processes of reasoning.

To argue that the acts of the insured which led to the fire may be considered intentional and voluntary, but the result unintentional, and that therefore the injuries, although accidental, were not "effected through accidental means," is, under the circumstances of this case, to propose a fantastic if not unthinkable theory. It can only mean that it may be supposed that the insured consciously and voluntarily meant to wrap himself in smoke and flame from fiercely burning material, and yet not be injured. It is a very different case from that of a person who takes a poisonous drug voluntarily in a quantity which he intends, but misjudges the effect of the dose, and thus kills or injures himself, when his purpose was the exact opposite. In such a case cited by the appellant (Carnes v. Iowa State Traveling Men's Association, 106 Ia. 281), a distinction between "accidental" and "effected by accidental means" was made, but there cannot reasonably be such a distinction made in the case at bar.

It is conceded by the appellant that "the law presumes in the absence of evidence to the contrary, that the injuries sustained by John Wilkinson were not self-inflicted" (defendant's instruction 22), but insists that this presumption has no probative force to establish the fact that the injuries were effected by accidental means. Under the facts and circumstances proven in this case, this last proposition is practically equivalent to denying the first. It is simply to repudiate the presumption against intentionally self-inflicted injuries. There being in reason but two alternatives, a presumption against one must at least aid and form a part of the proof of the other.

It is this that distinguishes this case from such a one as The Globe Insurance Company v. Gerisch, 163 Ill. 625, relied on by appellant. In that case, to sus-

tain a verdict, it had to be presumed or inferred that the deceased lifted a heavy box of ashes, and then presumed or inferred that a strain from which he afterward suffered was the result of that lifting. Perhaps either inference singly might have been properly made had the other been a matter proved, but the sequence could plainly not be. There were an infinity of causes that might have caused the strain, other than the one which, as the court says, was in itself "but a presumption drawn from other facts in evidence," namely, that the insured had lifted the box of ashes. We fail to see an analogy in the Gerisch case to the one at bar.

On the other hand, the authorities are many and forceful which declare that in a case like the present, circumstantial evidence concerning the death or injury, without proof of the precise manner in which it occurred, aided by the presumption against suicide or self-infliction of injuries, sufficiently satisfies the requirement, which is undoubtedly the general rule as dwelt upon by the appellant, that the claimant under an accident insurance policy must prove that the death or injury occurred through accidental means. And it has often been further held that external and violent means having been proven, the presumption against self-inflicted injuries and against murder, without further evidence, involves a *prima facie* showing of "accidental means." Travelers Ins. Co. v. McConkey, 127 U. S. 661; Mallory v. Travelers Ins. Co., 47 N. Y. 52; Fidelity & Casualty Company v. Freeman, 109 Fed. R. 847; Ætna Life Ins. Co. v. Milward, 118 Ky. 716; Cronkhite v. Travelers Ins. Co., 75 Wis. 116; Lumpkin v. Insurance Co., 11 Colo. App. 249; Preferred Accident Ins. Co. v. Fielding, 35 Colo. 19; Warner v. Accidental Association, 8 Utah, 431; Jones v. U. S. Accident Association, 92 Ia. 652; Conadeau v. American Accident Company, 95 Ky. 280; Travelers Ins. Co. v. Sheppard, 85 Ga. 751; Insurance Co. v. Bennett, 90 Tenn. 256; Standard Life & Accident Ins.

Co. v. Thornton, 100 Fed. R. 582; Jenkin v. Pacific Mutual Life Ins. Co., 131 Cal. 121; Meadows v. Pacific Mutual Life Ins. Co., 129 Mo. 76; Fidelity & Casualty Co. v. Weise, 182 Ill. 496.

In our examination of these cases, we have given due consideration to the argument of the appellant that in some the language which sustains the position we have indicated must be considered *obiter dictum*, and in some the result of a misinterpretation of the early case of Mallory v. The Travelers Ins. Co., 47 N. Y. 52, and that some of the cases we have named sustain the position of the defendant and not that of the plaintiff, while others are radically unsound. But we are not convinced by it. It seems to us that the general concensus of opinion in these authorities, whether the theory was directly involved or not, and whether the given case went off on it or not, is expressed, for a case like this, by the Circuit Court of Appeals of the United States for the Sixth Circuit, when it says:

"The death under such circumstances was by violent and external means, and the facts exclude every hypothesis except suicide or accident;" and then, speaking of the presumption against suicide, declares:

"This presumption must stand in the case and be decisive of it until overcome by testimony which shall outweigh the presumption" (Standard Life & Accident Ins. Co. v. Thornton, 100 F. R. 582); and by the Supreme Court of California when it says:

"That the courts will presume that the death was the result of an accident when nothing more is shown than that it was brought about by a violent injury, and the character of such injury is consistent with the theory of accident, seems to be a rule upheld by a great weight of authority;" and "If the circumstances placed in evidence and the inferences to be drawn therefrom and the presumptions arising thereon point clearly to an accidental injury, the plaintiff has made out a *prima facie* case and is entitled to a finding in

his favor." Jenkin v. Pacific Mutual Life Ins. Co., 131 Cal. 121.

Moreover, we think that this theory, instead of being "radically unsound," as the defendant claims, is consistent with right, reason and common sense, and was sanctioned by our Supreme Court in a case relied on by the defendant, but which in fact was decided on the question on whom the burden of proof was cast, not on the question of what would sustain that burden. In Fidelity & Casualty Co. v. Weise, 182 Ill. 496, the Supreme Court said: "The presumption of the law is that all men are sane and possessed of the love of life, are animated by the instincts of self-preservation and a natural desire to avoid injury and death. This presumption, in the absence of countervailing proof, may be sufficient in itself to establish that the death occurred otherwise than by self-inflicted injuries, and to cast upon the defendant company the burden of producing evidence on the point."

We do not see how the pertinency of this doctrine regarding the probative force of the presumption against self-inflicted injuries is affected in the present case, where there was no "countervailing proof," by the fact that in the Weise case there was strong countervailing evidence, the production of which left the burden of proof still on the plaintiff and called from the court the further statement that "the existence of the presumption" (against suicide) "had no efficacy to change the rule that the obligation of proving any fact lies upon the party who asserts the affirmative of the issue. In North Chicago Street Railway Co. v. Louis, 138 Ill. 9, we said: 'There may be evidence which, standing by itself, establishes a certain state of facts, but the evidence does not preponderate in favor of any given state of facts unless it is sufficient to outweigh all testimony introduced in opposition thereto.' "

In the case at bar not only was there no evidence offered tending, in the slightest degree, to establish or

suggest suicide or self-inflicted injuries, but moreover, in the exercise of a discretion undoubtedly vested in him (Dimick v. Downs, 82 Ill. 570-2; Mayer v. Brensinger, 180 Ill. 110-120), and in view of the pleas filed by defendant, the trial judge allowed the plaintiff to anticipate the suggested defense, and produce evidence in her case in chief, which aided and fortified the presumption against suicide or self-inflicted injuries, by showing a disposition, a temperament, a character, a physical condition and habits on the part of the deceased tending strongly to negative the probability of any self-infliction of the injuries in question.

The injuries, the defendant concedes in its reply brief, "doubtless unintentionally resulted in the death of the insured." It proceeds, nevertheless, to hint that the surroundings proved by the plaintiff looked toward self-inflicted injuries. The suggestion is without force in view of the evidence. It is so improbable as to be fantastic.

The views we have expressed dispose for us, not only of the contention of defendant that evidence is wanting to sustain a verdict for the plaintiff, and that the weight of the evidence is against any liability on the part of defendant, and of certain of its claims regarding the admission of improper evidence, but also of its criticism on the first instruction given at the request of the plaintiff.

We do not think this instruction was erroneous. If, as claimed by the defendant, the twenty-second instruction asked by the defendant and given, was inconsistent with it, which we do not feel called on to discuss, giving the twenty-second as asked was an error committed at the request of defendant, of which it cannot complain.

We are therefore brought to the secondary contentions of defendant in the case—that the "double" liability under policy number 729605 was not sustained by the evidence, that the weight of the evidence was against the verdict which asserted it, and that the

refusal of certain instructions which were requested by the defendant concerning it, was erroneous.

Our examination of the questions involved in these contentions leaves us satisfied with the action of the jury and of the trial judge.

The provision involved is a peculiar one. It provides the "double" indemnity for various selected accidents, certainly not more likely to occur than many others, and may well be supposed to be inserted as an additional attraction for the policy in its involving an extraordinary element of chance. Counsel for defendant, perhaps justifiably, repudiate the suggestion that the interpretation that would naturally be placed upon the term "building" in the condition under discussion by the persons to whom policies are sold, as including as well the "contents" of such building, should be controlling, although the illustration used by the plaintiff of "theatre" and "hotel" fires, "fires," that is, within the modern fire proof buildings, is not without force.

But we do not need to discuss this question, for we find nothing in the record which justifies the assertion of counsel for defendant, in the "Reply Brief," that the trial court was not able or willing to appreciate the difference between "the burning of a building" and "the burning of straw within a building."

In our opinion the question whether these injuries, resulting in the death of Wilkinson, were within the special provision of the policy, that is, "were sustained by external, violent and accidental means, in consequence of the burning of a building in which the insured was at the commencement of the fire," was for the jury to determine from the evidence.

We have given the evidence bearing on the question in detail in the statement prefixed to this opinion. Discussion or further analysis of it would not make it clearer. We think that it would justify the finding of any court or jury that the injuries which resulted in the death of the insured were received wholly or

partly after and "in consequence of" the ignition of the woodwork of the building and the heat and flame thereby produced, and not solely from the burning on the floor of the by no means profuse amount of straw, in which the fire very probably begun, perhaps from a lighted cigar of the deceased.

It was not necessary for the jury to determine or to find in what precise manner the fire began or how it proceeded or in what precise manner the deceased received each of the burns which together resulted in his death.

As the court said in Wright v. Sun Mutual Life Insurance Co., 29 Upper Canada Common Pleas, 221-233, "a. large proportion of accidental deaths occur under such circumstances that evidence is wanting as to the precise manner in which the deceased met his fate. Where the visible injuries plainly account for death, it can hardly be necessary to explain step by step how it happened."

But the jury, while not allowed to base findings necessary to their verdict on mere conjecture or speculation, or to make inferences necessary to those findings not fairly and reasonably deducible from facts in evidence, were not required, in considering what their findings should be, to exclude altogether from their minds the fact that there were numerous methods by which in pure accident and involuntarily the fire might have started.

That Mr. Wilkinson was in the loft when the fire commenced was, in our opinion, fairly deducible from the evidence. We should not have expected from any jury any other finding from the facts in evidence. That the injuries from which he died were the result wholly, or in material part, of the burning of the building, in contradistinction from its mere contents even, we also think a legitimate inference from the proof.

The evidence, which was admitted over objection,

tending to establish these propositions, we think competent.

This leaves only the question—was there reversible error in the refusal of any of the refused instructions tendered by the defendant? We think there was not.

Three strenuously insisted on—the 2nd, 10th and 11th—were objectionable, under the rule in Illinois, in singling out and calling attention to specific features of the evidence which as a whole were submitted to the jury. They were intended to call attention to the evidence of the burning of straw in the building as distinguished from everything else shown to have been aflame.

The proposition that the double benefit depended on the injuries resulting from the burning of a building was covered by the 14th, 15th and 23rd given instructions. There was no error in refusing to repeat it in the further form asked, that their resulting solely from the burning of something else would not satisfy the requirements of the policy. The defendant's argument on this point seems in the last analysis to be based on the position that the term "building," as used in the policy and the instructions was ambiguous in that it might or might not include a building's contents. If there were no ambiguity in its use in the policy, there was none in the instructions given, and the further instructions refused on the same point were not needed. If there was ambiguity, then the ambiguity must be resolved according to "fully established," "imperative" and "controlling" rules, in favor of the insured, "so as not to defeat his claim to the indemnity which in making the insurance it was his object to secure." Healey v. Mutual Accident Assn., 133 Ill. 556-561.

If there was ambiguity, therefore, the instruction refused would have been erroneous.

The first refused instruction was also covered by the 14th, 15th and 23rd, as given.

Counsel for defendant say in their argument that it

Wilkinson v. Aetna Life Ins. Co., 144 App. 38.

was essential that the expression "in consequence of" should be defined in more common and easily understood words. We know of none. Nor, in our opinion, did the evidence sustain the possible hypothesis included in the instruction, that the building did not burn until after Mr. Wilkinson was taken out.

The third refused instruction, so far as it was correct, was amply covered by those given. It was, in the form tendered, likely to mislead the jury in the direction pointed out in this opinion as indicated by the trend of the appellant's argument here—that is, into a confusion between mere conjectures and speculations on the one hand, and legitimate inferences from facts in proof on the other; in other words, between mere assumptions and circumstantial evidence.

The seventh refused instruction is plainly objectionable. In our opinion the assertion that there was no evidence in this case as to when the fire was started, is incorrect. There was evidence in the time of the alarm and the extent to which the fire had gone when the firemen arrived, from which the jury could legitimately infer approximately the time when it began.

The eighth refused instruction is objectionable because it contained an assumption that there was no evidence as to when the fire in question started. This was inaccurate, as we have pointed out in referring to the seventh instruction. If the assumption were not intended, the instruction was carelessly drafted. Many cases have been reversed by the Supreme Court on account of instructions no more clearly assuming a fact in dispute.

But if the instruction were to be construed as meaning that if the jury could not find from the evidence that the deceased entered the barn before the commencement of the fire, they could not otherwise infer it and give the double benefit provided for in the policy, it was abundantly covered by instructions given.

The objections to the refusal of the five other prof-

fered instructions have been waived by not arguing them in this court.

We find no lack of evidence to sustain the verdict and no reversible error in the matter of instructions or in the rulings on evidence. We believe that justice has been done between the plaintiff and defendant, and the judgment of the Superior Court is affirmed.

*Affirmed.*